IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| ALICE BRYANT,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil No. 3:13cv349 (JAG) |
| CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br>    Defendant. | )<br>)<br>)<br>) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION

Alice Bryant ("Plaintiff") is 41 years old and previously worked as a case manager and a social worker. On April 22, 2010, Plaintiff applied for Social Security Disability ("DIB"), claiming disability stemming from Chiari I malformation, depression and anxiety. Plaintiff's application was denied both initially and on reconsideration. On February 21, 2012, an administrative law judge ("ALJ") held a hearing during which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. On March 21, 2012, the ALJ issued a written opinion finding that Plaintiff was not disabled under the Social Security Act ("Act"). On March 28, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). Plaintiff challenges the ALJ's decision, arguing that substantial does not support the ALJ's residual function capacity ("RFC") assessment and that, as a result, substantial evidence cannot support the VE's testimony. The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the

entire record in this case, [1] the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, Plaintiff's medical history, Plaintiff's reported activities of daily living ("ADLs"), third-party function reports, Plaintiff's testimony and VE testimony are summarized below.

### A.   Plaintiff's Education and Work History

Plaintiff is 41 years old, and she was 36 years old on the alleged onset date. (R. at 143.) Plaintiff earned a bachelor's degree in social work. (R. at 29-30, 55-56, 162.) In the past, she worked as a social worker and as a case manager. (R. at 29-30, 55-56, 162.)

### B.   Plaintiff's Medical History

#### 1. Physical Treatment

On May 6, 2009, Plaintiff saw Peter L. Rigby, M.D. for issues relating to her balance and dizziness. (R. at 232-33.) Changing positions, such as rolling over in bed, head turning and standing suddenly, caused the dizziness. (R. at 232.) On May 15, 2009, an MRI showed a

---

[1]   The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

cerebellar tonsillar ectopia/mild Chiari I malformation.[2]  (R. at 228, 241.)  Dr. Rigby noted that

Plaintiff was alert and oriented, had a normal gait with impaired tandem walking and normal

voice and communication.  (R. at 230-31.)  Her speech discrimination was good to excellent and

speech recognition consistent.  (R. at 231.)  Plaintiff had a normally developed head with no

signs of trauma or lesions.  (R. at 231.)  Her audiogram test was normal on both her left and

right.  (R. at 231.)  Dr. Rigby assessed unsteadiness with neck turning, however, Plaintiff had

"no true vertigo."  (R. at 231.)  Dr. Rigby recommended vestibular rehabilitation with neck

therapy.  (R. at 231.)

On May 28, 2009, Plaintiff saw K. Singh Sahni, M.D. for an evaluation of her Chiari

malformation.  (R. at 255-57.)  Plaintiff complained of headaches, blurred vision, dizziness,

problems with her peripheral vision and tension in her shoulders, neck and back.  (R. at 255.)

She appeared well-nourished and developed, and suffered no acute distress.  (R. at 256.)  Further,

her head size was normal and no trauma existed.  (R. at 256.)  Plaintiff was alert, oriented and

cognitively intact.  (R. at 256.)  Both her vision and her cerebral examination were normal.  (R.

at 256.)  She exhibited maximum motor strength in all of her extremities.  (R. at 256.)  Though

Plaintiff had trouble with her tandem gait, she could walk heel-to-toe in a straight line.  (R. at

256.)  Dr. Sahni then scheduled Plaintiff for further MRI work.  (R. at 257.)

On June 18, 2009, Judy Helfman, P.T. noted that Plaintiff had excellent compliance with

her home exercise routine.  (R. at 258-59.)  Plaintiff felt "somewhat better" from her outpatient

therapy and home exercise program.  (R. at 261.)

---

[2]       Chari I malformation is the displacement of cerebellar tonsils into the cervical spinal
canal. *Chari I Malformation*, Neurosurgical Focus, July 2001, at 1, *available at* http://thejns.org/
doi/pdf/10.3171/foc.2001.11.1.1.  The most common symptom is pain, and presenting signs
include cerebellar, brainstem and spinal cord dysfunction. *Id.*

On June 18, 2009, John D. Ward, M.D. saw Plaintiff, and Dr. Ward's physical examination revealed normal extraocular movements, good muscle strength in all extremities and normal gait and station. (R. at 296-97, 330-32.) Dr. Ward reviewed Plaintiff's earlier MRI and indicated that Plaintiff suffered "Arnold-Chiari type I with very significant symptoms." (R. at 297, 331.)

On July 1, 2009, follow-up MRIs confirmed a Chiari I formation with cerebellar tonsils projecting approximately 7 millimeters below the foramen magnum with no evidence of a syrinax. (R. at 299-302, 333-36.) Plaintiff had normal flow of the cerebrospinal fluid. (R. at 300, 302, 334, 336.) On July 2, 2009, Dr. Ward found no structural reasons that explained Plaintiff's symptoms, and Dr. Ward referred her to neurology. (R. at 295, 329.)

On February 15, 2010, George E. Sanborn, M.D. saw Plaintiff, who complained of dizzy spells. (R. at 291.) Plaintiff had a normal ocular examination with no evidence of motility disturbance. (R. at 291.) Although Dr. Sanborn could not identify the exact cause of Plaintiff's symptoms, he did not believe that Plaintiff's symptoms were related to her eyes. (R. at 291.)

On March 11, 2010, Dr. Ward noted that Plaintiff had seen Dr. Taylor in neurology, but Dr. Taylor did not feel that Plaintiff had a significant neurological condition. (R. 292, 326.) Plaintiff again complained of neck and back pain. (R. at 292, 326.) Plaintiff exhibited a good gait, normal extraocular movements and was awake and alert. (R. at 292, 326.) Dr. Ward, when reviewing Plaintiff's MRIs, again noted that Plaintiff had good interior and posterior flow to her tonsils and brain stem. (R. at 292, 326.)

On June 14, 2010, an electroencephalogram, administered to Plaintiff in the awake state, was normal. (R. at 313.) An electromyogram report of a nerve conduction study was normal for the extremities on Plaintiff's left side. (R. at 308.)

4

On August 12, 2010, Plaintiff again complained of dizziness to Dr. Ward. (R. at 324, 353.) A physical examination of Plaintiff by Dr. Ward was normal. (R. at 324, 353.) Dr. Ward referred Plaintiff to an ear, nose and throat specialist. (R. at 324, 353.) On November 18, 2010, Plaintiff returned to Dr. Ward. (R. at 351-52.) The ear, nose and throat specialist believed that Plaintiff had a migranious type vestibular problem. (R. at 351.) Dr. Ward noted that, aside from the dizziness, Plaintiff had no other headache in the back of her head. (R. at 351.) While she experienced some unsteadiness during her Romberg testing, the remainder of her examination yielded normal results. (R. at 351.) On August 9, 2010, November 23, 2010, and January 12, 2012, medical examinations noted negative findings for dizziness, weakness, vertigo, headaches, numbness and tingling. (R. at 357-59, 367-68, 373-74.)

On November 9, 2010, Warren L. Felton, M.D. saw Plaintiff for a neuro-opthalmological consultation. (R. at 386-89.) Although Plaintiff complained of intermittent vertigo and lightheadedness, Dr. Felton noted that Plaintiff's description of her vertigo was unclear. (R. at 386.) Her symptoms were present daily. (R. at 387.) Further, she complained of migraine headaches, beginning in her childhood, and had some degree of discomfort daily. (R. at 386-87.) Dr. Felton opined that the neurologic and neuro-opthalmologic exams were essentially normal. (R. at 387-88.) Plaintiff's optic fundoscopy examination was normal in both eyes. (R. at 388.) Dr. Felton noted that Plaintiff was alert and oriented, had normal cranial nerves, had normal motor strength and tone in all extremities, had normal sensation to the touch, had normal gait and station, had fluent speech and had normal recent and remote memory, attention, concentration and fund of knowledge. (R. at 387-88.)

On May 17, 2011, Dr. Felton saw Plaintiff for a follow-up. (R. at 383-85.) While her headaches were not as frequent as her vertigo, Plaintiff complained that her episodes of vertigo

usually accompanied the headaches. (R. at 383.) Plaintiff had headaches once or twice each week. (R. at 383.) On that same day, Dr. Felton completed a checklist indicating that Plaintiff had vestibular migraines, vertigo, nausea, vomiting, dizziness and a minimal inability to concentrate/focus. (R. at 355.) Dr. Felton ordered a CTA aniography of Plaintiff's neck to assess her complaints of vertigo and loss of consciousness. (R. at 356.) The results indicated that all major vessels, including vertebrobasilar arteries, were intact and there was no evidence of vascular injury. (R. at 356.) On September 29, 2011, Dr. Felton again saw Plaintiff, who had episodic migraines that were improved with medication. (R. at 378, 381.) Both Plaintiff's neurological and neuro-opthalmological exams returned essentially normal results. (R. at 380-81.)

### 2. Mental Treatment

On March 26, 2010, Robin Wright, a licensed clinical social worker, performed a clinical evaluation of Plaintiff. (R. at 303-05.) Ms. Wright noted that Plaintiff appeared well-groomed, her speech was normal and relaxed, she had no perceptual disturbances, she was cooperative though anxious, her cognition was normal and her affect was appropriate. (R. at 305.) Plaintiff stated that she was irritable and depressed. (R. at 303.) She had anxiety about going out of the house. (R. at 303.) Further, she had difficulty sleeping at night. (R. at 303.) Plaintiff stated that she had been clean and sober for 15 years, but had been addicted to cocaine and had a history of binge drinking and using pot, cocaine and acid. (R. at 303.) She now avoided alcohol and drugs, because she had an addictive personality. (R. at 303.) On May 13, 2010, a follow-up note indicated that Plaintiff had moved into a house and experienced less stress, though she still was not sleeping well. (R. at 307.)

6

On November 16, 2010, licensed clinical psychologist Kevin McWilliams, Ph.D. saw Plaintiff. (R. at 337-39.) Plaintiff sought disability stemming from her dizziness. (R. at 337.) Dr. McWilliams noted that Plaintiff's medical history indicated that she had recurrent migraine headaches. (R. at 337.) Plaintiff drove alone to her appointment and arrived on time. (R. at 338.) She was fully oriented, alert, attentive, polite and cooperative. (R. at 338.) Her affect showed sadness and tension, but her speech was clear, goal-oriented and normal in pace and volume. (R. at 338.) Plaintiff had fair judgment and insight for her own safety and denied any plan to harm herself, but she had experienced suicidal thoughts recently. (R. at 338.) Plaintiff's depression stemmed from her medical and financial situations. (R. at 339.) She exhibited no signs of post-traumatic stress disorder. (R. at 339.) Plaintiff could interact appropriately with others and could tolerate normal workplace stressors, but her self-described incapacity from nausea and dizziness could interfere with her ability to manage simple job tasks. (R. at 339.)

C. Plaintiff's Reported Activities

On July 2, 2010, Plaintiff completed an Adult Function Report. (R. at 170-77.) Plaintiff wrote that she lived at home with her family. (R. at 170.) She served as the primary caretaker for her three children and did so to the best of her ability. (R. at 171.)

Plaintiff would have to sit when dressing if her vertigo was bad, used a bath seat in the shower to prevent falls, could take care of her hair and could feed herself. (R. at 171.) She needed no reminders to take care of her personal needs or taking medications. (R. at 172.) She prepared meals for herself and her children daily. (R. at 172.) She did laundry, washed dishes, swept floors and performed other minor cleaning, but sometimes chores would not get done for days due to her depression. (R. at 172.) Her children would assist with the chores, but she paid for all of her yard work to be done. (R. at 172.)

7

Plaintiff tried to get outside every day. (R. at 173.) She could both drive and ride in a car, though Plaintiff had others drive her many times. (R. at 173.) Every two weeks for a few hours each, Plaintiff would shop either in store or by mail. (R. at 173.) Further, she could pay bills, count change, handle a savings account and use a checkbook. (R. at 173.)

Plaintiff stated that she enjoyed scrapbooking, reading and photography. (R. at 174.) She had difficulty scrapbooking since the onset of her condition, however, because of the fine motor skills required. (R. at 174.) Additionally, Plaintiff experienced headaches from reading after 15 to 20 minutes. (R. at 174.) Plaintiff went to doctor appointments and to the grocery store on a regular basis. (R. at 174.)

Plaintiff indicated that her conditions affected her ability to lift, squat, bend, stand, reach, walk, hear, see, complete tasks, concentrate and use her hands. (R. at 175.) She could walk several yards on a good day and she would need 15 to 20 minutes of rest before resuming walking. (R. at 175.) Although she followed written directions well, Plaintiff often was easily distracted. (R. at 175.)

Plaintiff had no trouble getting along with authority figures and she had never been fired from a job because of problems getting along with others. (R. at 176.) She did not handle stress well, because her symptoms worsened with stress. (R. at 176.) She feared being alone and constantly worried. (R. at 176.) Plaintiff used a bath seat and glasses, but did not need any assistive devices for walking, such as crutches, walker, wheelchair or a cane. (R. at 176.)

On July 21, 2010, Plaintiff completed a Pain Questionnaire. (R. at 178-79.) She had pain in her back, hands, arms, feet, legs, shoulders, neck and head. (R. at 177.) Back pain accompanied most physical activity. (R. at 178.) Headaches stemmed from laughing, bright lights, noise, stress, strain of a bowel movement, coughing, sneezing or bending over. (R. at

8

178.) Plaintiff stated that she could not function at all when she had a headache. (R. at 179.) Rest, darkness and silence helped the headaches. (R. at 179.)

### D.  Third-Party Reports

On August 3, 2010, Audra F. Mills, friend of Plaintiff, completed a third-party function report. (R. at 180-190). Ms. Mills had known Plaintiff for thirteen years and saw her every month to two months and talked to her on the phone. (R. at 180-81.) Ms. Mills stated that Plaintiff cared for her three children, such as getting them to school, cleaning the house, preparing meals and shopping. (R. at 181.) Most of the responsibility for taking care of the children fell on Plaintiff, though Ms. Mills stated that Plaintiff's husband helped sometimes. (R. at 181.)

Ms. Mills indicated that Plaintiff had no problems with her personal care. (R. at 182.) Plaintiff prepared complete meals, but not as often as before. (R. at 183.) Ms. Mills indicated that Plaintiff needed to motivate herself more to make meals as she did before. (R. at 183.) Plaintiff cleaned and did laundry. (R. at 183.) She enjoyed scrapbooking, gourmet cooking and going to the beach. (R. at 185.)

Ms. Mills further indicated that while Plaintiff had not been fired or laid off because of problems with others, Plaintiff had difficulty at Zuni Presbyterian Homes that caused Plaintiff to look for another job. (R. at 187.) Ms. Mills indicated that Plaintiff used to handle stress better. (R. at 188.) Further, Plaintiff feared rejection. (R. at 188.)

### E.  Plaintiff's testimony before the ALJ.

On February 21, 2012, Plaintiff, represented by counsel, testified at the hearing before the ALJ. (R. at 29-54.) At the time of the hearing, Plaintiff was 39 years old, and she was legally

9

still married but separated from her spouse. (R. at 29.) She had children aged fifteen, nine and four. (R. at 29.) She had a bachelor of arts in social work. (R. at 30.)

Plaintiff occasionally had blackouts, which made it difficult for her to read. (R. at 30.) She could read and understand a newspaper article. (R. at 30.) Except during migraines, she had no difficulty writing. (R. at 30.) Further, Plaintiff could use a computer, write simple notes, spell and do basic math. (R. at 31.) She could handle a checking account and balance it when she had money. (R. at 31.)

Plaintiff did not need a cane or other assistive device when walking. (R. at 32-33.) She had migraines two to three times each week, resulting in dizziness and vertigo. (R. at 34.) Her headaches had gotten worse over the last three to four years. (R. at 34.) She rated her pain on a ten-point scale, with ten being the highest amount, as a seven or an eight on a daily basis. (R. at 35.) She took Frova, which helped with dizziness and pain sometimes, lowering her pain to about a two or three on the ten-point scale. (R. at 35-36.)

Plaintiff stated that she had no lifting, sitting, standing or walking limitations, except that she could not do anything when she got a migraine. (R. at 36-37.) She had no trouble handling, fingering or feeling. (R. at 37.) She did not believe that her anxiety, depression or bipolar disorder prevented her from working, but those conditions did play a role in her migraines. (R. at 37-38.) Plaintiff had feelings of hopelessness and felt very sad at times. (R. at 39.)

Plaintiff could function while on her medications, but she did not feel like she could go to work. (R. at 41.) Plaintiff's neighbor picked up Plaintiff's children from school and brought them home for Plaintiff. (R. at 42.) Plaintiff and her neighbor would have dinner together occasionally. (R. at 42.)

Plaintiff could learn a task by watching someone perform it. (R. at 43.) She could also learn by listening. (R. at 43.) She could read instructions well and follow verbal and written directions. (R. at 44.) She used the computer approximately three hours each week to help her children with school research, check Facebook, keep in touch with her family and check her child support. (R. at 44.)

Plaintiff could dress herself, bathe without assistance, make the bed, take out the garbage, cook, vacuum, do yard work, load the dishwasher, sweep, do laundry and grocery shop. (R. at 45-47.) She stated that she could do all of that on "good days," but not on "bad days." (R. at 46.) She had three to four good days each week and three to four bad days each week. (R. at 46.) Additionally, she could drive herself, though it sometimes precipitated her vertigo and dizziness. (R. at 47.)

F. VE Testimony.

A VE testified at the hearing before the ALJ and answered questions from the ALJ and counsel for Plaintiff. (R. at 54-61.) The ALJ asked that the VE assume a hypothetical person with the same age, educational and work experiences as Plaintiff with no exertional limitations, but certain postural limitations: (1) never able to climb ladders, ropes or scaffolds; (2) never be able to be around unprotected heights or moving mechanical parts; (3) and could understand, remember and carry out short, simple instructions. (R. at 58.)

The VE testified that an individual with those restrictions could not perform Plaintiff's past work. (R. at 58.) Next, the VE testified that an individual with those restrictions could work as a machine tender, with 89,000 jobs nationally and 720 locally, general office helper, with 41,000 nationally and 560 locally, and security worker, with 37,000 nationally and 340 locally. (R. at 58-59.) Finally, the VE responded to a question by counsel for Plaintiff by noting

that an individual who missed two days per month or more would not be maintained on the job nor be hired. (R. at 60.)

## II. PROCEDURAL HISTORY

On April 22, 2010, Plaintiff applied for DIB, alleging disability with an amended alleged onset date of May 12, 2009. (R. at 143, 225-26.) The Agency denied Plaintiff's application both initially and upon reconsideration. (R. at 78, 93.) Plaintiff then requested a hearing before an ALJ. (R. at 109-10.) On February 21, 2012, the ALJ held a hearing in which Plaintiff, represented by counsel, and a VE testified. (R. at 25-63.) On March 21, 2012, the ALJ issued his decision, finding that Plaintiff was not disabled under the Act. (R. at 11-24.) On March 28, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. at 1-9.)

## III. QUESTIONS PRESENTED

1.  Did the ALJ err in determining Plaintiff's RFC?

2.  Did the hypothetical posed to the VE account for all of Plaintiff's limitations?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court must determine whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if substantial evidence does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. An ALJ conducts this analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether substantial evidence supports the resulting decision of the Commissioner. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the

---

[3]    SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental

analysis ends and the claimant must be found "not disabled," regardless of any medical

condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the

analysis requires him to prove that he has "a severe impairment . . . or combination of

impairments which significantly limit[s] [her] physical or mental ability to do basic work

activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect

on one's ability to function. 20 C.F.R. § 404.1520(c).

    At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment, and

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is

required to determine whether the claimant can return to his past relevant work[4] based on an

assessment of the claimant's RFC[5] and the "physical and mental demands of work [the claimant]

---

activities. Your work may be substantial even if it is done on a part-time basis or if you do less,
get paid less, or have less responsibility than when you worked before." 20 C.F.R.
§ 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a
profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks
or hobbies, therapy or school attendance, and the like are not generally considered substantial
gainful activities. 20 C.F.R. § 404.1572(c).

[4]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5]    RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record. *Id.*

has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5).  The Commissioner can carry his burden in the final step with the testimony of a VE.  When a VE testifies, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A.    The ALJ's Opinion

First, the ALJ determined that Plaintiff met the insured status requirements under the Act and that she had not participated in SGA since June 18, 2009. (R. at 16.)  The ALJ next

determined that Plaintiff had the following severe impairments:  Chiari I malformation (cerebellar tonsillar ectopia), migraine headaches with dizziness, affective disorder characterized by major depression, an anxiety disorder and alcohol abuse.  (R. at 16.)  Next, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. at 17.)

After considering the record, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> [Plaintiff] can never climb ladders, ropes or scaffolds, and can never be exposed to unprotected heights or moving mechanical parts due to her Chiari I malformation, migraine headaches and dizziness.  Due to her psychiatric impairments, substance abuse, and headache pain, she is capable of understanding, remembering and carrying out instructions that are short and simple.

(R. at 18.)  The ALJ then determined that Plaintiff could not perform any past, relevant work. (R. at 22.)  Finally, after considering Plaintiff's age, education, work experience and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that she could perform.  (R. at 23.)

Plaintiff argues that substantial evidence does not support the ALJ's RFC assessment. (Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 9-13.)  Further, Plaintiff maintains that the ALJ's RFC assessment should have included an accommodation for absences or unscheduled breaks and, had the ALJ done so, the VE testimony would have been outcome-determinative and resulted in the ALJ's finding that Plaintiff was disabled.  (Pl.'s Mem. at 12.) Defendant contends that substantial evidence supports the ALJ's RFC determination and, as a result, the hypothetical that the ALJ posed to the VE included all of the limitations.  (Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No. 10) at 15-20.)

> B. Substantial evidence supports the ALJ's determination that Plaintiff could perform limited work at all exertional levels.

Plaintiff contends that the ALJ erred in rendering his RFC assessment. (Pl.'s Mem. at 9-13.) Defendant argues that substantial evidence supports the ALJ's RFC assessment. (Def.'s Mem. at 15-20.) Substantial evidence supports the ALJ's determination.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> [Plaintiff] can never climb ladders, ropes or scaffolds, and can never be exposed to unprotected heights or moving mechanical parts due to her Chiari I malformation, migraine headaches and dizziness. Due to her psychiatric impairments, substance abuse, and headache pain, she is capable of understanding, remembering and carrying out instructions that are short and simple.

(R. at 18.) Substantial evidence supports the ALJ's determination that Plaintiff could perform a full range of work with non-exertional limitations.

Objective medical evidence supports the ALJ's determination. On May 22, 2009, Dr. Rigby noted that Plaintiff was alert and oriented and had a normal gait, albeit with impaired tandem walking. (R. at 230-31.) Additionally, Plaintiff had normal voice, normal communication, and her speech discrimination was good to excellent. (R. at 231.) Her audiogram test was normal in both ears. (R. at 231.) Further, Dr. Rigby noted that Plaintiff had "no true vertigo." (R. at 231.)

On May 28, 2009, Dr. Sahni assessed that Plaintiff was not in acute distress and demonstrated no evidence of trauma. (R. at 256.) She was alert, oriented, cognitively intact and had full strength in all of her extremities. (R. at 256.) Plaintiff could walk heel-to-toe in a straight line. (R. at 256.)

On June 18, 2009, Dr. Ward's physical examination revealed normal extraocular movements, good muscle strength in all extremities and normal gait and station. (R. at 296-97, 330-31.) On July 1, 2009, Plaintiff had normal cerebrospinal fluid flow. (R. at 300, 302, 334, 336.) On February 15, 2010, Dr. Sanborn noted that Plaintiff had a normal ocular examination with no evidence of mobility disturbance. (R. at 291.) Further, Plaintiff had good gait, normal extraocular movements, was awake and alert. (R. at 292, 326.) On June 14, 2010, Plaintiff's electroencephalogram was normal. (R. at 313.) On August 9, 2010, November 23, 2010, and January 12, 2012, medical exams noted negative findings for dizziness, vertigo, weakness, numbness, tingling and headaches. (R. at 357-59, 367-68, 373-74.) On November 9, 2010, and September 29, 2011, Dr.

Felton noted that Plaintiff's neurologic and neuro-opthalmologic exams were essentially normal. (R. at 378-81, 387-89.)

Plaintiff's own statements also support the ALJ's determination. Plaintiff was the primary caretaker for her three children. (R. at 171.) Although she sometimes had to sit to get dressed and use a bath seat in the shower, Plaintiff had no problems taking care of herself or feeding herself. (R. at 172.) She prepared meals for herself and for her children every day. (R. at 172.) Plaintiff would shop, and she could pay the bills, count change, handle a savings account and use a checkbook. (R. at 173.) She would go to the grocery store and to doctor appointments on a regular basis. (R. at 174.) She did not use an assistive device for walking. (R. at 176.) She had no problem getting along with others. (R. at 176.)

Plaintiff testified that she could use a computer and she did so approximately three hours each week to check Facebook and her child support payments. (R. at 31, 44.) Except when she suffered from a migraine, Plaintiff had no limitations in her ability to lift, sit, stand or walk. (R. at 36.) She did not believe that her anxiety or depression prevented her from working. (R. at 37-38.) Further, her medications helped with dizziness and pain. (R. at 35-36.) Ms. Mills's third party reported much of the same information presented in Plaintiff's report and testimony. (R. at 180-90.)

Therefore, substantial evidence supports the ALJ's determination that Plaintiff could perform a full range of work with certain restrictions.

C. The hypotheticals posed to the VE accounted for all of Plaintiff's limitations.

Plaintiff argues that Plaintiff was disabled under the VE's testimony, because Plaintiff's RFC should have included limitations for absences or unscheduled breaks.

(Pl.'s Mem. at 12.)  Defendant responds that substantial evidence supports the testimony of the VE.  (Def.'s Mem. at 15-20.)

At the fifth step, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5).  The Commissioner can carry his burden in the final step with the testimony of a VE.  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

In this case, the ALJ determined that Plaintiff had the RFC to perform a full range of work with certain non-exertional limitations.  (R. at 18.)  Plaintiff argues that the RFC assessment should have included appropriate time for absences or unscheduled breaks.  (Pl.'s Mem. at 12.)  The ALJ, however, is only required to include those limitations that the ALJ considers credibly established. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  As

detailed above, substantial evidence supports the ALJ's RFC determination as to Plaintiff's limitations.

The ALJ posed a hypothetical to the VE regarding an individual with Plaintiff's RFC: no exertional limitations, but certain postural limitations: never able to climb ladders, ropes or scaffolds; never be able to be around unprotected heights or moving mechanical parts; and could understand, remember and carry out short, simple instructions. (R. at 58.) Thus, the hypothetical included all of Plaintiff's limitations. Further, the VE testified that an individual with those restrictions could work as a machine tender with 89,000 jobs nationally and 720 locally, general office helper with 41,000 nationally and 560 locally and security worker, with 37,000 nationally and 340 locally. (R. at 58-59.) Therefore, substantial evidence supports the ALJ's determination at step five.

## VI.  CONCLUSION

For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure**

21

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

                                                            /s/
                                            _____
                                            David J. Novak
                                            United States Magistrate Judge

Richmond, Virginia
Dated: January 14, 2014